1
2
3
4
5
6

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

7
8
9
10
11
12
13
14

MOSES ANDERSON, LAUNTE BARNES,      )
MARCUS D. JACKSON, FREDERICK        )    2:10-cv-03182-GEB-EFB
TOUSSAINT, and DONALD WALLACE,      )
                                    )
            Plaintiffs,             )    ORDER GRANTING MOTIONS FOR
                                    )    SUMMARY JUDGMENT AS TO
      v.                            )    BARNES, TOUSSAINT & WALLACE;
                                    )    GRANTING IN PART AND DENYING
THE VALSPAR CORPORATION, a          )    IN PART MOTION FOR SUMMARY
Delaware Corporation,               )    JUDGMENT AS TO JACKSON; &
                                    )    DISMISSING MOSES ANDERSON
            Defendant.              )
_____ )

15
16

    Defendant The Valspar Corporation ("Valspar") moves for

17

summary judgment under Federal Rule of Civil Procedure ("Rule") 56 on

18

the claims of Plaintiffs Launte Barnes, Marcus D. Jackson, Frederick

19

Toussaint, and Donald Wallace (collectively "Plaintiffs"). Valspar also

20

seeks dismissal of Moses Anderson, who died during the pendency of the

21

litigation. Plaintiffs allege claims for age, race, and disability

22

discrimination; retaliation; harassment; retaliation in violation of

23

public policy; and wrongful termination in violation of public policy.

Plaintiffs oppose Valspar's summary judgment motion.

24

**I. LEGAL STANDARD**

25

    A party seeking summary judgment bears the initial burden of

26

demonstrating the absence of a genuine issue of material fact for trial.

27

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "A fact is

28

'material' when, under the governing substantive law, it could affect

the outcome of the case." <u>Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n</u>, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). An issue of material fact is "genuine" when "'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Id.</u> (quoting <u>Anderson</u>, 477 U.S. at 248). To meet this burden, the movant must "inform[] the district court of the basis for its motion, and identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex</u>, 477 U.S. at 323 (internal quotation marks omitted).

If the movant satisfies its "initial burden," "the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, '*specific facts* showing that there is a genuine issue for trial.'" <u>T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987) (quoting Fed. R. Civ. P. 56(e)). The nonmoving party "cannot 'rest upon the mere allegations or denials of the adverse party's pleading' but must instead produce evidence that 'set[s] forth specific facts showing that there is a genuine issue for trial.'" <u>Estate of Tucker ex rel. Tucker v. Interscope Records, Inc.</u>, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting <u>Anderson</u>, 477 U.S. at 248). In evaluating the motion under Rule 56, "evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party." <u>Sec. & Exch. Comm'n v. Todd</u>, 642 F.3d 1207, 1215 (9th Cir. 2011) (citing <u>Johnson v. Paradise Valley Unified Sch. Dist.</u>, 251 F.3d 1222, 1227 (9th Cir. 2001)).

Further, Local Rule 260(b) requires:

Any party opposing a motion for summary judgment or summary adjudication [must] reproduce the itemized

> facts in the [moving party's] Statement of Undisputed Facts and admit those facts that are undisputed and deny those that are disputed, including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon in support of that denial.

E.D. Cal. L. R. 260(b). If the nonmovant does not "specifically . . . [controvert duly supported] facts identified in the [movant's] statement of undisputed facts," the nonmovant "is deemed to have admitted the validity of the facts contained in the [movant's] statement." <u>Beard v. Banks</u>, 548 U.S. 521, 527 (2006).

> Because a district court has no independent duty to scour the record in search of a genuine issue of triable fact, and may rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment, . . . the district court . . . [is] under no obligation to undertake a cumbersome review of the record on the [nonmoving party's] behalf.

<u>Simmons v. Navajo Cnty., Arizona</u>, 609 F.3d 1011, 1017 (9th Cir.2010) (citation and internal quotation marks omitted).

## II. UNCONTROVERTED FACTS

The following uncontroverted facts exist under Local Rule 260(b). Valspar is a global paint and coatings manufacturer that operates a warehouse in Sacramento. (Horace Decl., ECF No. 28, ¶¶ 3, 4.) Work in the Vaslpar warehouse was divided into three primary areas: (1) picking, (2) receiving and loading, and (3) put-away. (Peterson Decl. ¶ 7; Toussaint Dep. 61:12—24.) Picking consisted of physically picking up containers of paint designated for shipping, placing them on a shipping pallette, and riding a "walkie" machine to the designated containers. (Petereson Decl. ¶ 7; Toussaint Dep. 56:8—9.) Receiving and loading involved unloading and loading delivery trucks using a traditional sit-down forklift. (Toussaint Dep. 63:5—14.) Put-away meant moving paint filled containers from Valspar's manufacturing plant to Valspar's

warehouse using a stand-up forklift. (Toussaint Depo. 63:15—18.) Picking was the most physically taxing task. (Toussaint Dep. 63:19—64:1; Toussaint Decl. ¶ 4; Barnes Dep. 32:15—16.)

**A. Frederick Toussaint**

Frederick Toussaint, an African American man, was hired by Valspar in February 2002 into a general warehouse employee position. (Toussaint Dep. 53:3—7; Toussaint Decl. ¶ 2.) Starting around 2004, Toussaint exclusively worked on put-away, the least physically strenuous of the warehouse tasks. (Toussaint Dep. 59:5—11, 60:24—61:7, 65:12—14, 118:23—25.) Toussaint was the only employee assigned to put-away on a full time basis. (Toussaint Dep. 118:23—25.) Most employees were assigned to picking. (Wallace Dep. 45:7—9; Barnes Dep. 178:3—13.)

Around January 2010, Pat Peterson, Valspar's Division Distribution Manager, asked Toussaint to recertify for picking so that other employees could occasionally rotate out of the physically strenuous work of picking. (Peterson Decl. ¶ 7; Toussaint Dep. 113:21—115:21, 118:1—4.) Toussaint, who was then forty-six years old, told Peterson that he did not think he could pick well because of his age. (Toussaint Dep. 113:23—114:4, 117:20—22; Peterson Decl. ¶ 2; Toussaint Decl. ¶ 2.) Peterson told Toussaint that he "didn't care about [Toussaint's] age." (Toussaint Dep. 114:6—7.)

After this conversation with Peterson, Toussaint applied for a posted office position at Valspar. (Toussaint Dep. 14:9—14.) Toussaint was not interviewed for the position, and Valspar hired a Caucasian woman for the post. (Toussaint Decl. ¶¶ 7, 8.) The woman had previously filled the position as a temporary employee while the former position-holder, an African American, was on leave. (Pierre Decl. ¶¶ 10, 11.) Pierre, Valspar's human resources manager, explained that the woman was

hired because "she already knew all of the procedures and programs needed [to] perform the work." (Id. ¶ 10.)

Around February 2010, Toussaint complained to Jennifer Pierre, Valspar's Sacramento Human Resources Manager, about his "perception of the unfair treatment of African-Americans by Marty Rafter," a Valspar warehouse supervisor. (Toussaint Decl. ¶ 19; Pierre Decl. ¶¶ 1, 12; Peterson Decl. ¶ 4.) Toussaint heard Rafter state that he "'need[ed] to get rid of some of these fucking cancers.'" (Toussaint Dep. 107:9—10.) Toussaint did not know what Rafter meant at first, but once Anderson, Jackson, and Wallace (all African American plaintiffs in this action) were terminated days later, Toussaint believed that Rafter meant he needed to get rid of the African Americans when he said he needed to get rid of the cancers. (Toussaint Dep. 107:21—108:11.) Pierre conducted an investigation in response to Toussaint's complaint. (Pierre Decl. ¶ 12.) The investigation into the matter did not reveal that Rafter had engaged in any racial or ageist harassment. (Pierre Decl. ¶ 12.) Nonetheless, following the investigation, Rafter received disciplinary action regarding his unprofessional interactions with his subordinates. (Pierre Decl. ¶ 12.) Toussaint soon requested FMLA leave due to workplace stress from Rafter's comments. (Toussaint Dep. 180:23—181:3.) Before returning to work, under Valspar policy, Toussaint was asked to obtain a medical release confirming he had been cleared to work. (Pierre Decl. ¶ 12; Toussaint Decl. ¶ 21.)

On February 9, 2010, Toussaint injured his shoulder. (Toussaint Dep. 196:2—9.) When he returned to work, Toussaint was assigned to modified light duty tasks due to his injury, including picking up cigarette butts, dusting, sweeping, and laying down flooring. (Toussaint Dep. 201:6—16.) Although non-African American employees were

assigned such tasks, (Pierre Decl. ¶ 14; Wallace Dep. 62:4—8), Toussaint found this humiliating and discriminatory. (Toussaint Dep. 208:10—14.) At one point during Toussaint's employment, Toussaint heard Rafter refer to Peterson as a "grumpy old man." (Toussaint Dep. 133:22—135:2.) Ultimately, Toussaint was never made to go back to picking. (Toussaint Dep. 196:12—20.)

**B. Launte Barnes**

Launte Barnes is African-American. (Barnes Decl. ¶ 2.) Barnes was hired by Valspar in August 2006 as a warehouse picker. (Barnes Decl. ¶ 3; Barnes Dep. 54:5—6.) In March 2009, Barnes injured his shoulder in a non-work related accident, and he requested and received Family Medical Leave Act ("FMLA") leave until April 27, 2009. (Barnes Dep. 66:25—67:6.) After he was already expected back at work, Barnes requested additional FMLA leave through June 29, 2009. (Barnes Dep. 99:2—6 & Ex. 7.)[1] Barnes was granted additional FMLA leave through May 8, 2009, and was notified that he would exhaust his annual twelve weeks of FMLA leave on that day. (Pls.' Resp. to Def.'s SUF  ¶ 13.) Pierre specifically advised Barnes that to guarantee his position he had to return to work on May 8, 2009, and provide Valspar with a release to work and a list of his medical restrictions. (Pls.' Resp. to Def.'s SUF ¶¶ 14, 15.) As of May 8, 2009, Barnes had submitted neither a medical release to return to work nor a list of his medical restrictions. (Def.'s SUF ¶ 16.)[2] Valspar granted Barnes additional unpaid leave from

---

[1] Barnes disputes this fact, stating that his "declaration details the incidents concerning his FMLA leave." (Pls.' Resp. to Def.'s SUF ¶ 12.) However, Barnes's declaration does not contradict Valspar's stated SUF, which is duly supported by evidence in the record. Accordingly, this fact is deemed undisputed.

[2] Barnes disputes paragraphs 19 and 20 of Valspar's SUF, stating
(continued...)

May 9 through May 12, 2009, "in order for him to obtain his release to return to work on modified duty." (Pierre Decl. ¶ 5; Pls.' Resp. to Def.'s SUF ¶ 17.) On May 11, 2009, Pierre and Bjorkman, a Valspar Occupational Health Manager, telephoned Barnes and reminded him to provide the required medical paperwork. (Def.'s SUF ¶ 18; Pls.' Resp. to Def.'s SUF ¶ 18.) As of May 12, 2009, the end of the grace period, Valspar had not received documentation from Barnes regarding his medical restrictions or ability to return to work. (Barnes Decl. ¶ 10B; Def.'s SUF ¶ 20.) Barnes was terminated for this reason effective May 13, 2009. (Barnes Decl. ¶ 10C; Pierre Decl. ¶ 10.)[3] Pierre and Bjorkman made the decision to terminate Barnes. (Pls.' Resp. to Def.'s SUF ¶ 80.)

No one at Valspar ever made any inappropriate comments to Barnes based on his race. (Def.'s SUF ¶ 3; Pls.' Resp. to Def.'s SUF ¶ 3.) No one at Valspar ever made any inappropriate disability-related comments to Barnes. (Pls.' Resp. to Def.'s SUF ¶ 3; Barnes Dep.

---

[2](...continued)
that he "submitted a certificate showing his restrictions upon his return to work dated April 13, 2009." (Pls.' Resp. to Def.'s SUF ¶ 16 (citing Barnes Decl. ¶¶ 9-10 & Ex. 1).) However, this statement does not controvert the paragraphs that it purports to dispute, and it is contradicted by Barnes's own declaration. Accordingly, these facts are deemed undisputed.

[3] Valspar asserts that there was also an additional reason for Barnes's termination, namely, on May 13, 2009, Barnes told Bjorkman that he could not return to work until June 1, 2009, due to a prescheduled vacation. (See Def.'s SUF as to Barnes ¶ 21 (citing Pierre Decl. ¶ 9; Barnes Dep. 125:3—8).) In support of this contention, Valspar relies on Pierre's declaration to this effect, and Barnes's agreement, at one point during his deposition, that Barnes told Bjorkman that he "couldn't come back to work until June 1st." However, immediately after agreeing to this statement, Barnes repeatedly explained that he never told Bjorkman that he couldn't return to work until June 1st. (Barnes Dep. 125:9—127:5; see also 202:7—204:7.) Viewing this evidence in the light most favorable to Barnes, and drawing all reasonable inferences in his favor, Todd, 642 F.3d at 1215, Barnes has shown a genuine dispute of material fact concerning this reason for his termination.

171:13—15.) Barnes believes, however, that because of his race, (1) Peterson and Speidel did not talk to him, and if or when they did talk with him, they treated him less well than they did Caucasian workers, (158:4—163:9); (2) Villegas disclosed to Barnes's coworkers that Barnes left work due to a diarrhea incident, (id. 137:22—138:22); (3) Barnes was made to continue picking and "work extra hard," (Barnes Dep. 135:16—22, 27:13—18); and (4) the warehouse no longer felt like a positive team-based environment. (Id. 154:25—155:25.) Barnes was also "a good picker, the company needed him to pick, most of the assignments in the warehouse consisted of picking, and [Barnes] did not pick more than non-African American employees." (Def.'s SUF ¶ 5; Pls.' Resp. to Def.'s SUF ¶ 5.)

**C. Marcus D. Jackson**

In 2005 or 2006, Jackson began working for Ranstad Employment Agency, a temporary placement agency. (Jackson Dep. 26:25—27:3.) On August 15, 2009, Jackson was hired as a temporary Valspar employee through Ranstad. (Jackson Decl. ¶ 2.) Jackson, who is African American, was never hired as a full-time Valspar employee. (Jackson Decl. ¶ 3; Jackson Dep. 13:9.).

Soon after starting at Valspar, Jackson asked Villegas, Valspar's warehouse lead, if he could train Valspar's newest temporary employees. (Jackson Dep. 63:4—16.) Villegas refused and told Jackson that "'[t]emporary employees don't train other temps.'" (Jackson Dep. 63:17—21.) Training was typically conducted at the warehouse by Joe Dawson, a full-time Valspar employee and an African American. (Jackson Dep. 62:20—21, 63:25—1; Peterson Decl. ¶ 8.) However, on one occasion when the company was busy, Rueben, a temporary employee and a Hispanic who was by several months Jackson's senior, trained the new temps.

(Jackson Dep. 64:6—21, 66:8—11.) Jackson believed he was not permitted to train the temps because of his race. (Jackson Dep. 66:12—14.) Villegas's refusal to permit Jackson to train the new temps did not affect Jackson's pay, hours, or work on a daily basis. (Jackson Dep. 66:24—67:7.)

While at Valspar, Jackson applied for a posted warehouse supervisor position at Valspar for which he was qualified. (Jackson Decl. ¶ 11, Def.'s Resp. ¶ 10.) Jackson was not interviewed for the position, and Rafter, a Caucasian outside candidate, was hired to fill the post. (Jackson Decl. ¶¶ 12, 14; Def.'s Resp. ¶¶ 11, 13.) Peterson explained this decision as follows: "There was a concerted effort to hire a warehouse supervisor at the Sacramento facility from outside the current full-time workforce in the warehouse facility. Some of the reasons for that decision include[d]: limiting the cronyism that may exist when one goes from peer to manager, bringing in new ideas from someone outside the company, etc." (Peterson Decl. ¶ 9.) Peterson also declared that "[Jackson] was not the type of candidate I was looking for to fill the supervisor position because he was a new temporary worker in the facility." (Peterson Decl. ¶ 9.)

On January 13, 2010, Jackson told Villegas that he "didn't feel well." (Jackson Dep. 67:12—13.) Villegas told Jackson to go home. (Jackson Decl. ¶ 17; Jackson Dep. 67:12—16, 69:11—16.)[4] Villegas then

---

[4] Valspar objects on hearsay grounds to paragraph 17 of Jackson's declaration, in which Jackson states that Villegas told Jackson to go home. (See Jackson Decl. ¶ 17; Def.'s Objections to Pls.' Evidence ("Def.'s Objections") 7:20—8:5.) However, it is undisputed that Villegas was a Valspar employee who communicated Jackson's work assignments to him and had the power to permit Jackson to leave early. (Def.'s SUF as to Jackson ¶ 11; Def.'s Resp. to Jackson's SUF ¶ 5.) Accordingly, Villegas's statement permitting Jackson to go home is admissible
(continued...)

told Peterson "that Jackson had walked off the job without any justification." (Peterson Decl. ¶ 10.) Peterson "had no reason to doubt Mr. Villegas's statement and so [he] honestly believed that this had occurred." (Peterson Decl. ¶ 10.) As a result, Peterson requested that Rafter ask Ranstad, Jackson's staffing agency, not to have Jackson return to Valspar. (Peterson Decl. ¶ 10.)  When Jackson was asked not to return, he was next in line to become a permanent employee, and George, an Hispanic employee, was later hired as a permanent employee instead of Jackson. (Jackson Decl. ¶ 21.)[5]

Jackson was thirty years old when he was terminated. (Jackson Decl. ¶¶ 2, 17.) Jackson did not tell anyone at Valspar that Villegas had given him permission to go home. (Jackson Dep. 89:6—16.) Jackson never complained about perceived unfairness, unlawful discrimination, harassment, wage and hour violations, or safety violations at Valspar. (Jackson Dep. 83:18—25.) No one made any racially derogatory comments to Jackson while he was at Valspar. (66:21—23, 79:21—80:12, 93:19—23,

---

[4] (...continued)
nonhearsay since it is "offered against [Valspar] . . . and was made by [Valspar's] employee on a matter within the scope of that [employment] relationship and while it existed." Fed. R. Evid. 801(d)(2)(D); see also Hilao v. Estate of Marcos, 103 F.3d 767, 775 (9th Cir. 1996).

[5] Valspar objects to paragraph 21 of Jackson's declaration, which states "George, the Hispanic who was next after me for [a] permanent position, was hired as a permanent employee of Valspar," on the grounds that it is inadmissable opinion evidence and lacks foundation. (See Jackson's Decl. ¶ 21; Def.'s Objections 6:25—7:12.) This objection is overruled, since this evidence "could be admitted into evidence at trial in a variety of ways." Fraser v. Goodale, 342 F.3d 1032, 1037 (9th Cir. 2003) (noting that inadmissable "evidence produced in an affidavit may be considered on summary judgment if the [out-of-court] declarant could later present the evidence through direct testimony"); Hughes v. United States, 953 F.2d 531, 543 (9th Cir. 1992) ("While the facts underlying the affidavit must be of a type that would be admissible as evidence, Fed. R. Civ. P. 56(e), the affidavit itself does not have to be in a form that would be admissible at trial.").

96:1—5.) However, at one point, Villegas told another Valspar Sacramento warehouse employee, Joe L. Dawson, "that he mistook [Dawson] for another African American . . . because all African Americans look alike." (Dawson Decl. ¶ 11.) During a safety meeting, Villegas also told Dawson, who was sitting in the back of the meeting, "that this was not the sixties and [Dawson] did not have to sit in the back anymore." (Id. ¶ 10.)

**D. Donald Wallace**

Wallace, an African American, was hired by Valspar for a warehouse position on October 13, 2009. (Wallace Decl. ¶ 2, 3.) Before he was hired, Wallace interviewed with Pierre, Peterson, and Newhouse and was told about his position's requirements. (Wallace Dep. 40:1—18.) At the interview, Wallace was told "that attendance [was] an important component of the position." (Peterson Decl. ¶ 9.) Afterwards, Wallace received an Offer Letter that stated that he was ineligible for vacation or sick leave for the first calendar year of his employment. (Pierre Decl. ¶ 4 & Ex. 1.) Further, when Wallace worked at Valspar, "Valspar's policy did not provide sick days during the 90 day probationary period." (Pierre Decl. ¶ 6.) Although Wallace did not read the Offer Letter, he understood that he was subject to a ninety-day probationary period during which time he had to "prove [himself]" based on his job performance. (Wallace Dep. 42:1—11.)

During his probationary period, Wallace was absent from work for five days. (Pierre ¶ 7 & Ex. 2.) Peterson "believed the number of [Wallace's] absences during his probationary period . . . was excessive and unacceptable," especially given the emphasis on attendance at Valspar. (Peterson Decl. ¶ 11.) "[A]s such, [Peterson] decided to

terminate Plaintiff Wallace's employment at the end of his probationary period." (Peterson Decl. ¶ 11.)

During his employment, Wallace applied for a posted position as a warehouse supervisor with Valspar. (Wallace Decl. ¶ 11; Wallace Dep. 101:24—102:2.) Wallace was not interviewed, and Rafter, a Caucasian external candidate, was hired for the position. (Wallace Decl. ¶ 11.) The position required a bachelor's degree and supervisory experience, but Wallace's only resumé on file with Valspar stated that Wallace lacked a bachelor's degree and supervisory experience. (Wallace Dep. 105:6—106:15; Pierre Decl. ¶ 8.) Pierre "did not believe [Wallace] met the minimum qualifications for the position based on the application for employment he had submitted upon his hire only a short time before the posting." (Pierre Decl. ¶ 8.)[2]

While at Valspar, Wallace told Villegas his back was sore from picking, and Villegas assigned Wallace to modified light duty work. (Wallace Dep. 76:24—77:2.) Wallace was then approached by Valspar's safety coordinator and asked to take a drug test, because he had stated that he hurt himself. (Id. 77:2—7.) Wallace explained that he was sore, but had not hurt himself. (Id. 77:7—15.) He was not made to take a drug test, (id. 77:20—21), but believed that he asked to take a drug test

---

[2] Valspar argues in its Reply brief for the first time that Wallace "did not meet the minimum eligibility criteria" for this position, (Reply 7:20—21), because Valspar's Job Posting Program guidelines state that any current employee may apply for a posted position "as long as . . . [t]he employee has been in their position for no less than six (6) months," (Toussaint Decl. Ex. 1), but Wallace applied for a new position fewer than three months after he was hired. (Wallace Dep. 1010:24—102:2.) However, this argument is not considered since "it is generally 'improper for the moving party to . . . introduce new facts or different legal arguments in the reply brief [beyond] . . . [those that were] presented in the moving papers.'" Ojo v. Farmers Grp., Inc., 565 F.3d 1175, 1186 n.13 (9th Cir. 2009).

because of his race. (Id. 76:14—77:19.) Valspar's safety policy requires that a drug test be taken following a workplace injury. (Peterson Decl. ¶ 8; Wallace Dep. 78:21—25.) After this incident, Wallace complained to Villegas that he was treated unfairly because of his race by Villegas and Valspar's safety coordinator. (Wallace Dep. 92:25—94:20.)

During his time at Valspar, Wallace also heard Villegas make multiple comments that Wallace believed were derogatory race-related remarks. (Wallace Dep. 64:21—24, 66:10—15.) Villegas once told Wallace and Jackson, both African Americans, "'you people need to speed up.'" (Id. 66:17—67:19.) Villegas also twice stated "'I'm going to replace you people with my people.'" (Wallace Dep. 64:21—65:2, 68:7—9.) Wallace believed Villegas meant that he was going to replace African Americans with Hispanics, although Villegas could have meant that he was going to replace temporary employees with permanent employees. (Id. 65:13—66:12). Wallace also heard from a coworker that Rafter stated "'I'm going to get rid of these cancers,'" right before Jackson was fired. (Id. 83:5—9.)

No one at Valspar discriminated against Wallace because of his age. (Wallace Dep. 64:7—14.) Wallace did not complain about or report discriminatory acts to Valspar management. (Wallace Dep. 92:25—93:13; Peterson Decl. ¶ 4.)

### III. DISCUSSION

**A. Claims Alleging Discrimination Under the California Fair Employment and Housing Act, Cal. Gov't Code § 12940(a)**

**1. Frederick Toussaint**

**(a) Race Discrimination**

Toussaint alleges generally that Valspar discriminated against him because of his race in violation of the California Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12940(a). (Compl. ¶¶ 19,

13

20.) Toussaint appears to claim that he was discriminated against on the basis of race when (1) Peterson and Rafter requested that he be recertified on the walkie and rotated into picking, (Toussaint Dep. 113:17—115:24); (2) he was not selected for the office position for which he applied, (id. 144:9—14; 145:2—5); (3) Valspar required that he submit a medical release to return to work after he requested FMLA leave due to work-related stress, (id. 187:4-20, 193:11-16, Ex. 4); and (4) he was asked to pick up cigarette butts while on modified duty due to an injury. (Id. 138:19-24; 200:23-201:16.)

Valspar argues that Toussaint cannot establish a prima facie case of race discrimination as required under FEHA because Toussaint has no evidence suggesting discriminatory racial animus and because, except for when he was not interviewed, Toussaint was not subjected to an adverse employment action. (Def.'s Mot. as to Toussaint, ECF No. 43, 12:17—14:27.) Valspar also contends that even if Toussaint is found to state a prima facie case, "he has submitted no evidence, let alone *substantial responsive evidence*" to refute Valspar's nondiscriminatory, legitimate reasons for its actions. (Id. 15:23—17:3.)

"'[W]hen entertaining motions for summary judgment in employment discrimination cases arising under state law, federal courts sitting in diversity must apply the McDonnell Douglas burden-shifting scheme as a federal procedural rule.'" Zeinali v. Raytheon Co., 636 F.3d 544, 552 (9th Cir. 2011) (applying McDonnell Douglas to FEHA discrimination claim) (quoting Dawson v. Entek Int'l, 630 F.3d 928, 934 (9th Cir. 2011)); see also Guz v. Bechtel Nat'l Inc., 24 Cal. 4th 317, 354 (2000) (noting that "California has adopted the three-stage burden-shifting test established by the United States Supreme Court" in McDonnell Douglas for FEHA discrimination claims).

Under this procedural rule, "the employee must first establish a prima facie case of discrimination." Reid v. Google, 50 Cal. 4th 512, 520 n.2 (2010). "Once the employee satisfies this [prima facie] burden, there is a presumption of discrimination, and the burden then shifts to the employer to show that its action was motivated by legitimate, nondiscriminatory reasons." Id.; see also Lawler v. Montblanc N. Am., LLC, __ F.3d __, 2013 WL 135752, at *4 (9th Cir. 2013). "If the employer meets this burden, the employee then must show that the employer's reasons are pretexts for discrimination, or produce other evidence of intentional discrimination." Reid, 50 Cal. 4th at 520 n.2; see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802—04 (1973).

However, these burdens change when a defendant seeks summary judgment.

> When an employer moves for summary judgment, "the burden is reversed . . . because the defendant who seeks summary judgment bears the initial burden. Thus, [t]o prevail on summary judgment, [the employer is] required to show either that (1) plaintiff could not establish one of the elements of [the] FEHA claim or (2) there was a legitimate, nondiscriminatory reason for its decision . . . . If the employer meets its burden, the discharged employee must demonstrate either that the defendant's showing was in fact insufficient or . . . that there was a triable issue of fact material to the defendant's showing."

Lawler, __ F.3d __, 2013 WL 135752, at *5 (quoting Dep't of Fair Emp't & Hous. v. Lucent Techs., Inc., 642 F.3d 728, 745—46 (9th Cir. 2011)) (internal citations omitted) (alternations in original); see also Washington v. Cal. City Corr. Ctr., 871 F. Supp. 2d 1010, 1021 (E.D. Cal. 2012); Jones v. Dep't of Corr. & Rehab., 152 Cal. App. 4th 1367, 1379 (2007); Hanson v. Lucky Stores, Inc., 74 Cal. App. 4th 215, 224—25 (1999).

To state a prima facie case, an employee must show that "(1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." Guz, 24 Cal. 4th at 354; accord Lawler, __ F.3d __, 2013 WL 135752, at *5. However, "'[t]he requisite degree of proof necessary to establish a prima facie case . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence.'" Schechner v. KPIX-TV, 686 F.3d 1018, 1022 (9th Cir. 2012) (quoting Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994)); see also Brandon v. Rite Aid Corp., Inc., 408 F. Supp. 2d 964, 978 (E.D. Cal. 2006); O'Mary v. Mitsubishi Electronics Am., Inc., 59 Cal. App. 4th 563, 582 (1997). Thus to secure summary judgment, an employer may show that the employee cannot establish one or more of these elements of his prima facie case. Alternatively, the employer may proffer a "legitimate, nondiscriminatory reason" for its action that is "facially unrelated to prohibited bias" and, if true, would "preclude a finding of discrimination." Guz, 24 Cal. 4th at 358. The employer "need not persuade the court that it was actually motivated by the proffered [legitimate] reason[]." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510 (1993) (quoting Tex. Dep't of Cmmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981)); see also Muzquiz v. City of Emeryville, 79 Cal. App. 4th 1106, 1117 (2000). Rather, it need only articulate via "admissible evidence, the reason's for the plaintiff's" termination. Burdine, 450 U.S. at 255; see also Bd. of Trs. of Keene State Coll. v. Sweeney, 439 U.S. 24, n.2 (1978) (stating "employer's burden is satisfied if [it] simply 'explains what [it] has done'").

16

If the employer succeeds in setting forth a legitimate nondiscriminatory reason for its action, to avoid summary judgment using circumstantial evidence, the plaintiff must produce specific and substantial evidence of pretext. Batarse v. Serv. Emps. Int'l Union Local 1000, 209 Cal. App. 4th 820, 835—36 (2012); see also Vasquez v. Cnty. of L.A., 349 F.3d 634, 642 (9th Cir. 2003) ("To show pretext using circumstantial evidence, a plaintiff must put forward specific and substantial evidence challenging the credibility of the employer's motives."). Speculation about an employer's motives is not substantial responsive evidence. Cucuzza v. City of Santa Clara, 104 Cal. App. 4th 1031, 1038 (2002); see also Flores v. Merced Irr. Dist., 758 F. Supp. 2d 986, 999 (E.D. Cal. 2010). "'Rather, the employee must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the [asserted] non-discriminatory reasons.'" Villanueva v. City of Colton, 160 Cal. App. 4th 1188, 1195 (2008) (quoting Morgan v. Regents of the Univ. of Cal., 88 Cal. App. 4th 52, 75 (2000)).

Here, Valspar has articulated a "legitimate, nondiscriminatory reason" for its decision not to promote Toussaint, which is "*facially unrelated to prohibited bias*" and if true, would "preclude a finding of discrimination." Guz, 24 Cal. 4th at 358. Valspar hired a Caucasian woman for the job because she had filled the position as a temporary employee and "she already knew all of the procedures and programs needed [to] perform the work." (Pierre ¶ 10; Toussaint Decl. ¶ 7.) See Morgan, 99 Cal. App. 4th at 79 (noting that candidate's "familiarity with the tasks involved" in the job may constitute legitimate, nondiscriminatory

reason to hire her). Valspar did not have a policy requiring it to interview Toussaint when he applied for the position. (Pierre Decl. ¶ 10; Toussaint Decl. Ex. 1.)

Toussaint fails to counter Valspar's nondiscriminatory rationale for not hiring him with evidence from which a reasonable inference could be drawn that Valspar's action was "false or pretextual." Sandell v. Taylor-Listug, Inc., 188 Cal. App. 4th 297, 314 (2010). Therefore, Toussaint has not raised a genuine issue of genuine issue of material fact concerning Valspar's decision not to hire him for the office position for which he applied.

Further, Toussaint fails to establish a prima facie case concerning his remaining allegations of race discrimination since he did not suffer "an adverse employment action." Guz, 24 Cal. 4th at 354. Under FEHA, an adverse employment action "materially affect[s] the terms and conditions of employment" and "is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion." Yanowitz v. L'Oreal USA, Inc., 36 Cal. 4th 1028, 1036, 1054-55 (2005). Thus "[n]ot every employment decision amounts to an adverse employment action," Strother v. S. Cal. Permanente Med. Grp., 79 F.3d 859, 869 (9th Cir. 1996), and "[m]inor or relatively trivial adverse actions . . . are not actionable." Yanowitz, 36 Cal. 4th at 1054. Toussaint's allegations—that he was asked to recertify for picking (the task performed by most employees), to pick up cigarette butts while on modified light duty due to an injury, and to provide a release to return to work after requesting FMLA leave due to work-related stress—do not constitute adverse employment actions. See, e.g., McRae v. Dep't of Corr. & Rehab., 142 Cal. App. 4th 377, 393 (2006) ("A transfer is not an adverse action simply because the plaintiff finds it to be 'personally

humiliating.'") To the contrary, Valspar has shown that employees on modified duty were asked to pick up cigarette butts, that obtaining a clearance to return to work following leave for work-related stress was in line with company policy, and that Toussaint never actually did modify his job duties. Accordingly, this portion of Valspar's motion is granted.

**(b) Age Discrimination**

Toussaint appears to allege that Valspar discriminated against him based on his age, (Compl. ¶ 19), since after he was asked to recertify for picking, Peterson told Toussaint he "didn't care about [Toussaint's] age," (Toussaint Dep. 114:6—7, 117:4—22, 125:9—16), and since Rafter referred to *Peterson*, not Toussaint, as a "grumpy old man." (Toussaint Dep. 133:22—135:2.) However, these "[m]inor or relatively trivial" events do not constitute adverse employment actions, Yanowitz, 36 Cal. 4th at 1054, and even if they were viewed as part of an adverse action when "consider[ing] the totality of the circumstances," id. at 1036, Toussaint fails to demonstrate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Valspar's] proffered legitimate reasons" for asking Toussaint to recertify for picking—namely, to permit other employees to rotate out of the physically intensive work. Villanueva, 160 Cal. App. 4th at 1195. Further, Rafter's singular comment about *Peterson* is insufficient to "materially affect the terms and conditions of [*Toussaint's*] employment." Yanowitz, 36 Cal. 4th at 1036. Accordingly, this portion of Valspar's motion is granted.

**2. Launte Barnes**

**(a) Race Discrimination**

Barnes alleges that he was discriminated against on the basis of race since (1) Peterson and Speidel did not talk to him or talk to him in the same manner as they did Caucasian workers, (Barnes Dep. 158:4—163:9); (2) Villegas told Barnes's coworkers that he left work due to a diarrhea incident, (id. 137:22—138:22); (3) Barnes was made to pick and "work extra hard," (id. 135:16—22, 27:13—18); (4) the warehouse no longer felt like a positive team-based environment, (id. 154:25—155:25); and (5) Barnes was terminated effective May 13, 2009. (Id. 140:11—23.)

Valspar argues that it terminated Barnes based on a legitimate, nondiscriminatory reason—namely, Barnes's failure to timely supply a release to return to work following expiration of his annual FMLA leave.[3] (Mot. as to Barnes 12:23—14:2.) Since Valspar's stated reason for its action is "*facially unrelated to prohibited bias*," and "if true, would thus preclude a finding of *discrimination*," it is a "legitimate, nondiscriminatory reason" under McDonnell Douglas. Guz, 24 Cal. 4th at 358.

Accordingly, to defeat summary judgment, Barnes "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Valspar's] proffered legitimate reason[] for its action that a reasonable factfinder could rationally find [it] unworthy of credence, and hence infer that [Valspar] did not act for the [asserted] non-discriminatory reason[]." Morgan, 88 Cal. App. 4th at 75. Barnes has not met this burden. Barnes's opposition does not address Valspar's stated reason for his termination. Barnes's

---

[3] Barnes's FMLA leave expired on May 8, 2009. Beforehand, Barnes was notified that he needed to provide Valspar with a release to return to work and a medical restriction list by that day, but he did not do so. Barnes was then granted until May 12 to provide Valspar with these documents, but Barnes again did not do so by the deadline.

discrimination allegations—that Peterson and Speidel did not talk to him or talk to him in the same manner as they did Caucasian workers, that Villegas told Barnes's coworkers that he left work due to a diarrhea incident, that Barnes was made to pick, and that the warehouse stopped feeling like a positive team-based environment—do not involve Pierre or Bjorkman, the individuals who made the decision to terminate Barnes. (See Pls.' Resp. to Def.'s SUF ¶ 80.) Nor does Barnes argue that Pierre or Bjorkman knew of, or were involved in, these other actions. Accordingly, Barnes's remaining allegations of discrimination are unrelated to the decision to terminate him, and cannot provide "specific and substantial" circumstantial evidence of pretext as to that decision. Vasquez, 349 F.3d at 642.

Valspar also argues that none of the "alleged discriminatory 'actions' complained of by [Barnes] amount to an adverse employment action sufficient to support a claim for discrimination." (Mot. as to Barnes 9:25—26.) Barnes's allegations are insufficient to constitute an adverse employment action. Though Barnes was directed to work hard picking, so too were many workers, and picking was the most common job in the warehouse. Further, Barnes's sense that Peterson and Speidel did not speak to him is likewise not actionable. See McAlindin v. Cnty. of San Diego, 192 F.3d 1226, 1238 (9th Cir. 1999) (concluding plaintiff's "sense of isolation" or ostracism at work does not constitute an adverse employment action under FEHA). Similarly, Villegas's comment to others about Barnes's diarrhea and Barnes's feeling that Valspar was no longer a team may have been embarrassing or upsetting to Barnes, but this does not make them adverse actions. See Yanowitz, 36 Cal. 4th at 1054 & n.13 (finding plaintiff's feeling of humiliation or embarrassment alone inadequate to demonstrate adverse employment action). Nor, when viewed

together, do these actions "materially affect the terms and conditions of [Barnes's] employment" nor "impair [Barnes's reasonable] job performance or prospects for advancement or promotion," as required for an adverse action. <u>Yanowitz</u>, 36 Cal. 4th at 1036, 1054-55. Accordingly, since Barnes has not demonstrated that Valspar's stated nondiscriminatory reason for his termination was false or pretextual, and since he has failed to state a prima facie case for the remainder of his allegations, this portion of Valspar's motion is granted.

### (b) Disability Discrimination

Valspar argues it is entitled to summary judgment concerning Barnes's FEHA disability discrimination claim, since Barnes's only basis for this claim is his termination, and Barnes fails to address or rebut Valspar's stated nondiscriminatory reason for terminating Barnes—namely, Barnes's failure to timely supply his release to return to work and list of medical restrictions. (Mot. as to Barnes 15:5—16:12.) Barnes fails to address this portion of Valspar's motion, and he submits no evidence of pretext. Barnes admits that no one at Valspar ever made any inappropriate disability-related comments to him, and that other Valspar employees were granted disability leave and permitted to return to work both on regular and light duty. Since Valspar set forth a legitimate nondiscriminatory reason for terminating Barnes, <u>see</u> <u>supra</u>, and Barnes fails to show that this reason is "false or pretextual," <u>Sandell</u>, 188 Cal. App. 4th at 314, this portion of Valspar's motion is granted.

### 3. Marcus D. Jackson

Jackson alleges he was discriminated against on the basis of race (Compl. ¶¶ 19, 20) when (1) he was not allowed to train other temporary employees, (Jackson Dep. 66:12—14.); (2) he did not get an interview for a supervisory position, (<u>id.</u> 75:10-76:18); and (3) his

assignment with Valspar ended because Villegas wrongfully told Peterson that he had walked off the job. (Id. 67:11-25, 69:21—23.) Valspar argues that Jackson fails to establish a prima facie case since no one at Valspar made any racially derogatory comments to Jackson, (Jackson Dep. 66:21—23, 79:21—80:12, 93:19—23, 96:1—5), and Jackson presents "nothing but pure speculation" to establish that these actions occurred because of his race. (Mot. as to Jackson 8:14—15.) Valspar further argues that its actions were based on legitimate nondiscriminatory reasons, which Jackson fails to address or dispute. (Id. 9:2—13:17.)

Valspar asserts that Jackson was not allowed to train new temporary workers because he himself was a new, temporary worker, and "Valspar typically does not have temporary employees train other temporary employees." (Peterson Decl. ¶ 8.) This explanation constitutes a facially nondiscriminatory reason, see Guz, 24 Cal. 4th at 358, which Jackson must show was a pretext for unlawful discrimination to avert summary judgment. Jackson's singular example of an inconsistency (when the company was very busy, an Hispanic temporary worker who was Jackson's senior by multiple months trained new temporary workers) does not constitute "specific and substantial" circumstantial evidence of pretext. Vasquez, 349 F.3d at 642. Accordingly, Valspar is entitled to summary judgment on Jackson's FEHA race discrimination claim to the extent that Jackson's claim is premised on Villegas's refusal on one occasion to permit Jackson to train other temporary employees.

Valspar is also entitled to summary judgment on Jackson's race discrimination claim to the extent that Jackson's claim is premised on Valspar's failure to hire Jackson for a supervisory position for which Jackson applied. Peterson explained that the company made an effort "to hire a warehouse supervisor at the Sacramento facility from outside the

current full-time workforce" and that Jackson did not fit the bill since "he was a new temporary worker in the facility." (Peterson Decl. ¶ 9.) Peterson's explanation constitutes a "legitimate, nondiscriminatory reason" for Valspar's action. Guz, 24 Cal. 4th at 358. Far from showing this rationale potentially "unworthy of credence," Batarse, 209 Cal. App. 4th at 834, Jackson has agreed that he may not have received an interview because he was a temporary worker, (Jackson Dep. 77:25—78:4),[4] and he has not presented other evidence of pretext or falsity.

Valspar also argues that it has articulated a nondiscriminatory reason for terminating Jackson since Peterson "was informed by Mr. Villegas that Plaintiff Jackson had walked off the job at a time when he was not authorized to leave," Peterson had "no reason to doubt what Mr. Villegas had told him, and such conduct is clearly unacceptable performance and subject to termination." (Def.'s Mot. as to Jackson 9:27—10:2.)

However, Jackson appears to base his discrimination claim on a "cat's paw" theory of liability, wherein "[t]he employer [Valspar] is at fault because one of its agents [Villegas] committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision" against Jackson—even though the adverse action was carried out by Peterson, who lacked any

---

[4] Valspar admits in response to Plaintiffs' SUF that Jackson was qualified for the supervisory position. (Def.'s Resp. to Jackson's SUF ¶ 10.) In its Reply brief, however, Valspar argues for the first time that "Jackson did not meet the eligibility criteria in Valspar's job posting program because Plaintiff Jackson was employed for less than four months at the time he applied for the position," and only workers who have been employed for six months or more are eligible for Valspar's job posting program. (Reply 8:27—28:3; Toussaint Decl. Ex. 1.) The court disregards this argument since "it is generally 'improper for the moving party to . . . introduce new facts or different legal arguments in the reply brief [beyond] . . . [those that were] presented in the moving papers.'" Ojo, 565 F.3d at 1186 n.13.

discriminatory intent. Staub v. Proctor Hosp., 131 S. Ct. 1186, 1193 1192 (2011). Although it is uncontroverted that Peterson was not motivated by animus, the fact "[t]hat [Peterson] was the ultimate decisionmaker does not warrant judgment as a matter of law in favor of [Valspar]." Muniz v. United Parcel Serv., Inc., C 09-01987 CW, 2011 WL 3740808, at *3 (N.D. Cal. Aug. 23, 2011); see also Staub, 131 S. Ct. at 1193 ("[T]he exercise of judgment by the [unbiased] decisionmaker does not prevent the earlier agent's action (and hence the earlier agent's discriminatory animus) from being the proximate cause of the harm."); Galdamez v. Potter, 415 F.3d 1015, 1026 n.9 (9th Cir. 2005) (stating nondiscrimination laws "may still be violated where the ultimate decision-maker, lacking individual discriminatory intent, takes an adverse employment action in reliance on factors affected by another decision-maker's discriminatory animus"). Since Peterson terminated Jackson based on Villegas's recommendation, and since Valspar does not assert that it conducted an independent investigation before ratifying Villegas's action, cf. Poland v. Chertoff, 494 F.3d 1174, 1183 (9th Cir. 2007), to prevail on its summary judgment motion Valspar must show either that there was a legitimate, nondiscriminatory reason for Villegas's action or that Jackson cannot establish one of the elements of his prima facie case. Lucent Techs., Inc., 642 F.3d at 745. Valspar offers no evidence concerning Villegas's motives and thus fails to supply a legitimate, nondiscriminatory reason for Villegas's action. Therefore, Valspar must show that Jackson cannot establish a prima facie case concerning his termination. Valspar does not dispute the first three elements of Jackson's prima facie case—namely, that Jackson was a member of a protected class, competently performed his position, and suffered an adverse employment action. (Mot. as to Jackson 8:8—9:3.)

Accordingly, the only issue is whether Jackson has shown "some other circumstance suggest[ing] discriminatory motive" under the fourth element of his prima facie case. <u>Guz</u>, 24 Cal. 4th at 354.

Here, it can be inferred from Jackson's evidence that he was eligible to become a permanent employee; that Villegas misrepresented that Jackson walked off the job; that Jackson was therefore asked not to return to Valspar, and consequently that a less senior non-African American worker became a permanent employee instead of Jackson. (<u>See</u> Jackson Dep. 69:21—70:13.) Jackson also presents circumstantial evidence of Villegas's discriminatory intent via the declaration of Joe L. Dawson, a Valspar Sacramento warehouse employee. Villegas told Dawson "that he mistook [Dawson] for another African American . . . because all African Americans look alike." (Dawson Decl. ¶ 11.) During a safety meeting, Villegas also told Dawson, who was sitting in the back of the meeting, "that this was not the sixties and [Dawson] did not have to sit in the back anymore." (<u>Id.</u> ¶ 10.) Given this evidence, this portion of Valspar's motion is denied. <u>See generally</u> <u>Metoyer v. Chassman</u>, 504 F.3d 919, 937 (9th Cir. 2007) (stating decisionmaker's bigoted remarks may tend to show discriminatory intent even if directed at someone other than the plaintiff); <u>Johnson v. United Cerebral Palsy/Spastic Children's Found. of L.A. & Ventura Cntys.</u>, 173 Cal. App. 4th 740, 767 (2009) (approving of use of "me too" evidence of discrimination to defeat employer's summary judgment motion in FEHA case).

For the stated reasons, Valspar's summary judgment motion on Jackson's FEHA race discrimination claim is granted, except to the extent that it is premised upon Valspar's termination of Jackson's employment.

**4. Donald Wallace**

Wallace alleges that he was discriminated against on the basis of race in violation of FEHA because he was (1) asked, but not made, to take a drug test after complaining about physical pain at work, (Wallace Dep. 92:2—6); (2) passed over for the warehouse supervisor position for which he applied, (id. 116:25—117:13); and (3) terminated at the close of his 90-day probationary period. (Id. 87:2—88:20.) Valspar argues that Wallace cannot make out a prima facie case and that it had a legitimate business reason for its actions, which Wallace cannot and does not demonstrate were pretext for discriminatory animus. (Mot. as to Wallace 12:12—18:11.) Specifically, Valspar presents evidence that Wallace was (1) asked to take a drug based on  Valspar's policy of requiring drug tests in the event of workplace injuries; (2) passed over for the position for which he applied since he was not considered eligible based on his only resumé on file and since Valspar wanted to fill the position with someone from outside the facility; and (3) terminated at the close of his probationary period based on his documented absenteeism. (Mot. as to Wallace 12:12—13:19.) Since these reasons are "*facially unrelated to prohibited bias*," Valspar has articulated "legitimate, nondiscriminatory reason[s]" for its actions. Guz, 24 Cal. 4th at 358; see also Trujillo v. U.S. Postal Serv., 330 Fed. App'x 137, 140 (9th Cir. 2009) (recognizing absenteeism as legitimate nondiscriminatory reason for termination). Therefore to avert summary judgment, Wallace "must demonstrate either that [Valspar's] showing was in fact insufficient or . . . that there was a triable issue of fact material to [Valspar's] showing" of legitimate nondiscriminatory business reasons. Lucent Techs., Inc., 642 F.3d at 746 (quoting Hanson, 74 Cal. App. 4th at 225).

However, Wallace's race discrimination "claim fails because . . . he cannot establish that [Valspar's] articulated

non-discriminatory reason[s] for [its actions are] pretextual." Vasquez, 349 F.3d at 641; Davenport v. Bd. of Trs. of State Ctr. Cmty. Coll. Dist., 654 F. Supp. 2d 1073, 1104 (E.D. Cal. 2009) (granting summary judgment for employer since even "assuming arguendo that [plaintiff] could establish a prima facie case [overcoming defendant's arguments that he cannot], he has not presented evidence giving rise to a triable issue of disputed material fact as to any pretext"). Wallace does not specifically respond to Valspar's asserted nondiscriminatory reasons. Wallace does argue that Villegas's statements—"you people need to speed up" and "I'm going to replace you people with my people"—demonstrate discrimination. However, these statements, and Wallace's speculation as to Valspar's discriminatory intent based on the statements, do not show that Valspar's stated reasons for its actions are "unworthy of credence." Morgan, 88 Cal. App. 4th at 75; see also Martin v. Lockheed Missile & Space Co., 29 Cal. App. 4th 1718, 1735 (1994) (noting employee's "speculation that [employer's] showing was pretextual or false" is insufficient to defeat summary judgment). Accordingly, even assuming that Wallace establishes a prima facie case of discrimination, he failed to allege sufficient facts to show that Valspar's proffered reasons for its actions were mere pretext. See Schuler v. Chronicle Broad. Co. Inc., 793 F.2d 1010, 1011 (9th Cir. 1986). Thus this portion of Valspar's motion is granted.

**(b) Age Discrimination**

Valspar argues that Wallace's age discrimination claim fails since Wallace offers no evidence of age discrimination and admits that no one at Valspar discriminated against him because of his age. (Mot. as to Wallace 18:21—22 (citing Wallace Dep. 64:3—14).) Wallace does not reference or oppose this portion of Valspar's motion. Since Wallace does

not present evidence permitting "a reasonable inference of age discrimination," <u>Hersant v. Dep't of Soc. Servs.</u>, 57 Cal. App. 4th 997, 1002 (1997), this portion of Valspar's motion is granted.

## B. Claims Alleging Retaliation Under the California Fair Employment and Housing Act, Cal. Gov't Code § 12940(h)

### 1. Frederick Toussaint

Toussaint contends that he was retaliated against in violation of FEHA after he complained of Rafter's comments to Pierre since he was (1) required to submit a release to return to work following his request for stress leave and (2) asked to pick up cigarette butts as part of his modified light duty assignments. Valspar argues that Toussaint "cannot establish a prima facie case of retaliation since he was not subjected to any adverse employment actions." (Mot. as to Toussaint 18:27—28.) Toussaint does not respond to this portion of Valspar's motion.

"[T]o establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." <u>Yanowitz</u>, 36 Cal. 4th at 1042; <u>accord</u> <u>Strother</u>, 79 F.3d at 868. Adverse "employment actions that can give rise to a claim for retaliation are identical to the actions that can give rise to a claim for discrimination" under FEHA. <u>Jones v. Lodge at Torrey Pines P'ship</u>, 42 Cal. 4th 1158, 1168 (2008); <u>Yanowitz</u>, 36 Cal. 4th at 1050—51. Since submitting a medical release to return to work and picking up cigarette butts while on light duty do not constitute adverse employment actions, <u>see</u> <u>supra</u>, Toussaint fails to plead a prima facie case of FEHA retaliation. Accordingly, this portion of Valspar's motion is granted.

## 2. Launte Barnes

Barnes appears to allege that Valspar retaliated against him by terminating him after he took disability-related FMLA leave. (Compl. ¶¶ 23, 24.) Valspar argues that it terminated Barnes based on a nondiscriminatory reason, namely, Barnes's failure to timely submit a release to return to work and list of medical restrictions, and that Barnes fails to submit specific and substantial evidence demonstrating that this reason was false or pretextual. (Mot. as to Barnes 16:13—17:10.) Since Valspar has articulated a legitimate and nondiscriminatory reason for terminating Barnes, see supra, and since Barnes does not show that Valspar's stated reason is "false or pretextual," Sandell, 188 Cal. App. 4th at 314, this portion of Valspar's motion is granted.

## 3. Marcus D. Jackson

Valspar argues that "Jackson's claim for retaliation fails because it is undisputed that he never engaged in any protected activity," and "Jackson admits that during his employment with Valspar he never complained about any perceived unlawful discrimination, harassment, wage and hour violation or safety violation." (Mot. as to Jackson 13:27—14:2 (citing Jackson Dep. 83:1—84:11.) Jackson does not respond to this portion of Valspar's motion.

"[T]o establish a prima facie case of retaliation under the FEHA, a plaintiff must show," among other things, that "he or she engaged in a 'protected activity.'" Yanowtiz, 36 Cal. 4th at 1042. Although "protected conduct can take many forms" under the statute, id., Jackson has done nothing to show that his actions fall within even this broad standard. Accordingly, this portion of Valspar's motion is granted.

**4. Donald Wallace**

Wallace appears to allege that Valspar retaliated against him by terminating him after he complained to Villegas of unfair race-based treatment concerning the drug test incident. (Compl. ¶¶ 23, 24; Wallace Dep. 92:25—94:20.) Valspar seeks summary judgment against this claim, arguing that Wallace never put management on notice that he was complaining of discrimination on the basis of a protected characteristic. (Mot. as to Wallace 19:1—20:22.) Wallace does not respond to this portion of Valspar's motion.

To state a prima facie FEHA retaliation case, Wallace must present evidence that Valspar "was aware" that Wallace engaged in protected activity by opposing a practice prohibited under FEHA. Morgan, 88 Cal. App. 4th at 70; Cal. Gov't Code § 12940(h). "Here, the evidence shows the only person [besides co-Plaintiff Toussaint] to whom Plaintiff complained about [] discriminatory conduct was [Villegas]." Washington v. Cal. City Corr. Ctr., 871 F. Supp. 2d 1010, 1029 (E.D. Cal. 2012). "There is no evidence to suggest [Villegas] was a managerial employee or someone involved in" terminating Wallace. Id. (Wallace Dep. 104:24—105:4; Peterson Decl. ¶¶ 10, 11; Pierre Decl. ¶¶ 8—10.) "Nor is there evidence to suggest [Villegas] ever communicated Plaintiff's complaint to" Pierre and Peterson, who made the decision to terminate Wallace. Thus, Wallace's retaliation claim fails since it is "undisputed that the individuals who made the decision to terminate [Wallace] had no knowledge of" Wallace's discrimination complaint. Rivera v. Nat'l R.R. Passenger Corp., 331 F.3d 1074, 1079 (9th Cir. 2003). Accordingly, this portion of Valspar's motion is granted.

**C. Claims Alleging Harassment Under the California Fair Employment and Housing Act, Cal. Gov't Code § 12940(j)**

**1. Frederick Toussaint**

Toussaint alleges Valspar subjected him to a hostile work environment in violation of FEHA, Cal. Gov't Code § 12940(j), since (1) Peterson stated that he didn't care about Toussaint's age, (Toussaint Dep. 114:6—7); (2) Rafter stated Peterson was a "grumpy old man," (id. 133:22—134:10); and (3) Rafter stated he wanted to get rid of the cancers. (Toussaint Dep. 107:9—10.)

"To establish a claim for harassment [under FEHA], a plaintiff must demonstrate that: (1) [he or] she is a member of a protected group; (2) [he or] she was subjected to harassment because [he or] she belonged to this group; and (3) the alleged harassment was so severe [or pervasive] that it created a hostile work environment." Lawler, at *7; Lyle v. Warner Bros. Television Prods., 38 Cal. 4th 264, 220 (2006). Acts of "harassment cannot be occasional, isolated, sporadic, or trivial." Aguilar v. Avis Rent A Car Sys., Inc., 21 Cal. 4th 121, 131 (1999). Instead, the harassment complained of must be so severe or pervasive as to "alter the conditions of employment." Lyle, 38 Cal. 4th at 220; Aguilar, 21 Cal. 4th at 130.

Here, Toussaint has not shown that the comments in question evince age- or race-based *discrimination*. Further, even if tied to Toussaint's age or race, these three isolated comments, expressed during the course of Toussaint's ten year long employment at Valspar, are neither severe nor pervasive enough to preclude summary judgment. See Muller v. Auto. Club of S. Cal., 61 Cal. App. 4th 431, 446 (1998) (finding the three "isolated remarks" made to plaintiff "cannot reasonably be viewed as 'a concerted pattern of harassment of a repeated routine or generalized nature'" supporting a FEHA harassment claim), *overruled on other grounds by* Colmenares v. Braemar Country Club, Inc.,

29 Cal. 4th 1019, 1031 n.6 (2003). Accordingly, this portion of Valspar's motion is granted.

//

**2. Marcus D. Jackson**

Valspar argues it is entitled to summary judgment on Jackson's FEHA harassment claim since "Jackson admits that no one at Valspar ever made any derogatory comment to him relating to his race," and since hearing about discrimination second-hand is insufficient to sustain a hostile environment claim. (Mot. as to Jackson 14:12—13 (citing Jackson Dep. 79:21—80:12).) Jackson does not respond to this portion of Valspar's motion.

When a plaintiff is not personally subjected to harassing conduct, to state a FEHA hostile environment claim, "the plaintiff generally must show that the harassment directed at others was in [his or] her immediate work environment, and that [he or] she personally witnessed it." Lyle, 38 Cal. 4th at 285. In this case, Jackson argues neither that he was personally harassed nor that he witnessed the harassment of others. Jackson further states that he is "not aware" of anyone at Valspar who made derogatory comments related to race. (Jackson Dep. 80:8—12.) Accordingly, this portion of Valspar's motion is granted.

**3. Launte Barnes**

Valspar seeks summary judgment on Barnes's FEHA harassment claim, arguing that Barnes cannot show that he was subjected to severe or pervasive harassment since Barnes merely alleges that (1) Spiedel once yelled at him, (Barnes Dep. 166:23—168:20); (2) Peterson did not stop to talk to Barnes "[a] couple times," (id. 162:11—13); and (3) Rafter stated that he wanted to "get rid of the cancers" over six months after Barnes's termination. (Id. 184:23—185:4.) Barnes does not respond

to this portion of Valspar's motion, and he admits that no one at Valspar ever made inappropriate comments to him based on his race or disability. Since Barnes's evidence does not show that he suffered harassment so severe or pervasive as to "alter the conditions of [his] employment," Aguilar, 21 Cal. 4th at 130, this portion of Valspar's motion is granted.

**4. Donald Wallace**

Wallace alleges he was subjected to a hostile work environment in contravention of FEHA because (1) Villegas told Wallace and Jackson "'you people need to speed up,'" (Wallace Dep. 66:17—67:19); (2) Villegas said "'I'm going to replace you people with my people,'" (id. 64:21—65:2); and (3) Rafter said "'I'm going to get rid of these cancers.'" (Id. 53:5—9.) Valspar seeks summary judgment on this claim, arguing that even if "these comments could somehow be construed to relate to [race or age]," they "fall[] woefully short of the evidence necessary to establish a claim for unlawful harassment." (Mot. as to Wallace 21:13, 21:21—22.) Wallace does not oppose this portion of Valspar's motion. Even assuming these facially neutral statements relate to protected characteristics, Wallace has not shown these comments were so severe or pervasive as to "alter the conditions of [his] employment." Lyle, 38 Cal. 4th at 220. Accordingly, this portion of Valspar's motion is granted.

**D. Retaliation in Violation of Public Policy**

**1. Frederick Toussaint**

Toussaint claims he was retaliated against in violation of public policy prescribed in Cal. Lab. Code § 1102.5 after he complained to Pierre, Valspar's human resources manager, about perceived racial discrimination. (Compl. ¶¶ 33—37.) Section 1102.5 protects employees who

34

disclose "information to a government or law enforcement agency" based on a reasonable suspicion of unlawful activity. This law "concerns employees who report to public agencies. It does not protect [Toussaint], who reported his suspicions directly to his employer." Green v. Ralee Eng'g Co., 19 Cal. 4th 66, 77 (1998). Accordingly, since Toussaint's internal complaints to Pierre are not protected activity under § 1102.5, this portion of Valspar's summary judgment motion is granted.

**2. Launte Barnes, Marcus D. Jackson & Donald Wallace**

Valspar seeks summary judgment on Barnes, Jackson, and Wallace's Cal. Lab. Code § 1102.5 claims of retaliation in violation of public policy. Section 1102.5 states that "[a]n employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation." Cal. Lab. Code § 1102.5(b). Valspar argues that Barnes "testified that he never made any complaints regarding conduct he considered to be unlawful," (Mot. as to Barnes 18:23 (citing Barnes Dep. 171:16—25));[5] "Jackson testified that he never made any complaints regarding conduct he considered to be unlawful," (Mot. as to Jackson 15:9—10 (citing Jackson Dep. 83:6—25)); and Wallace submits "no evidence that he ever made any complaint to a government or law enforcement agency" concerning conduct he considered unlawful. (Mot. as to Wallace

---

[5] At his deposition, when asked if he had ever made "any complaints to anybody in *management* with regard to what [he] thought was unlawful conduct while he was] employed at Valspar," Barnes stated "as far as the racial discrimination, I didn't ever speak to nobody about that." (Barnes Dep. 171:16—18, 171:23—25.)

22:4.) Neither Barnes, Jackson, nor Wallace counter this portion of Valspar's motion. Accordingly, since Barnes, Jackson, and Wallace have not shown that they "disclos[ed] a violation of state or federal regulation to a governmental or law enforcement agency," <u>Green</u>, 19 Cal. 4th at 77, this portion of Valspar's motion is granted.

### E. Wrongful Termination in Violation of Public Policy

### 1. Marcus D. Jackson

Valspar also seeks summary judgment on Jackson's claim that he was wrongfully terminated in violation of public policy. (Compl. ¶¶ 38—39.) Valspar asserts that it "cannot be liable" for this claim, since among other things "only an employer can be liable for the tort of wrongful discharge in violation of public policy." (Mot. as to Jackson 15:26—28.) Valspar argues that it never employed Jackson, and Jackson admits that he was never employed by Valspar. (Mot. as to Jackson 16:12—13 (citing Jackson Dep. 13:9, 48:12, 67:12—16).) In support of its position, Valspar relies on Jackson's deposition testimony in which Jackson states that he worked at Valspar as "a temp to hire" and was placed there through Randstad, a placement agency.[6]

"[T]here can be no [common law tort of wrongful discharge in violation of public policy] cause of action without the prior existence of an employment relationship between the parties." <u>Miklosy v. Regents of Univ. of Cal.</u>, 44 Cal. 4th 876, 900 (2008). Thus "the breach of the employment relationship is an indispensable element of the tort" of common law wrongful discharge. <u>Id.</u> Under California common law:

> [t]he essential characteristic of [the] employment relationship is the right to control and direct the

---

[6] Elsewhere, Valspar admits that "Jackson was hired by THE VALSPAR CORPORATION . . . as a temporary employee on August 15, 2009." (Def.'s Resp. to Jackson's SUF ¶ 2.)

> activities of the person rendering service, or the manner and method in which the work is performed. Existence of the right is often tested by determining whether, if instructions were given, they would have to be obeyed. The right to terminate the service at any time is a strong circumstance tending to show the right to control.

*Villanazul v. City of L.A.*, 37 Cal. 2d 718, 721 (1951); *Bradley v. Cal. Dep't of Corr. & Rehab.*, 158 Cal. App. 4th 1612, 1625 (2008); *see also Vizcaino v. U.S. Dist. Court for W. Dist. of Wash.*, 173 F.3d 713, 724 (9th Cir. 1999) (noting that the "determination of whether temps were [defendant's] common law employees turns . . . on application of the [relevant common law] factors to their relationship" with defendant).

Neither Jackson's deposition testimony that he worked as "a temp to hire" nor Valspar's admission that it "hired" Jackson establishes that Valspar did or did not employ Jackson. Rather, for the purposes of a common law wrongful discharge claim, the existence of an employment relationship depends on the common law employment test, the "keystone" of which is the employer's direction and control of the person rendering service. *Bradley*, 158 Cal. App. 4th at 1625; *see also Gallegos v. City of L.A.*, 308 F.3d 987, 992 (9th Cir. 2002) (noting that legal conclusions often depend on what the parties did, not how they characterized what they did). It is undisputed that Villegas, Valspar's warehouse lead, "communicated to [Jackson] his work assignment," (Def.'s Resp. to Jackson's SUF ¶ 5), and that Peterson, a Valspar supervisor, "asked that [Jackson] not return" to Valspar and obtained Jackson's dismissal. (Peterson Decl. ¶ 10.) Accordingly, since it is uncontroverted that Valspar "control[led] and direct[ed] Jackson's] activities," *Villanazul*, 37 Cal. 2d at 721, Valspar's argument that it is not liable for Jackson's wrongful termination since it never employed him is denied.

Valspar also argues that "[b]ecause Plaintiff Jackson's claims for discrimination, harassment and retaliation fail," his common law wrongful discharge claim "fails as well." (Def.'s Mot. as to Jackson 16:28—17:1.) While Valspar is correct that a common law wrongful discharge claim is not viable absent a violation of "an important policy based on a statutory or constitutional provision," Green, 19 Cal. 4th at 79, here, Jackson has raised a genuine issue of material fact as to whether or not Valspar discriminated against him on the basis of race in violation of § 12940(a). "Because [Jackson's race] discrimination claim under FEHA survives summary judgment, so too does h[is] claim for wrongful termination in violation of public policy." Earl v. Nielsen Media Research, Inc., 658 F.3d 1108, 1118 (9th Cir. 2011); see also Walker v. Brand Energy Servs., LLC, 726 F. Supp. 2d 1091, 1106 (E.D. Cal. 2010) (noting FEHA race discrimination violations may give rise to common law wrongful discharge claims). Accordingly, this portion of Valspar's motion is denied.

**2. Launte Barnes & Donald Wallace**

Valspar argues it is entitled to summary judgment on Barnes and Wallace's wrongful termination in violation of public policy claims, arguing that Barnes and Wallace cannot prevail on these tort claims unless they can also establish a violation of FEHA. (See Mot. as to Barnes 19:1—7; Mot. as to Wallace 22:19—23:5.) Since the tort of wrongful discharge requires a violation of "an important policy based on a statutory or constitutional provision," Green, 19 Cal. 4th at 79, and since neither Barnes nor Wallace has successfully set forth such a claim, Valspar prevails on this portion of its motion. See Sanders v. Arneson Prods., Inc., 91 F.3d 1351, 1354 (9th Cir. 1996) (stating "claim under state law for tortious discharge in violation of public policy .

. . falls with [plaintiff's other] claim" since tortious discharge claims do not lie against employers who have not violated the law).

//

### F. Punitive Damages

Valspar also seeks summary judgment on Jackson's claim for punitive damages, arguing that Jackson has not presented evidence, as he must, "that an officer, director, or managing agent was aware of Mr. Villegas's comment [telling Jackson to go home], knew it was false and malicious and then ratified the decision" to terminate Jackson. (Mot. as to Jackson 19:7—9.)[7] Jackson does not respond to this portion of Valspar's motion.

For an employer to be liable for exemplary damages based upon its ratification of the wrongful conduct of an employee, see Cal. Civ. Code § 3294(b), the employee must submit clear and convincing evidence of the employer's "actual knowledge of the conduct and its outrageous nature." Coll. Hosp., Inc. v. Superior Court, 8 Cal. 4th 704, 726 (1994); see also Cruz v. HomeBase, 83 Cal. App. 4th 160, 168 (2000) (noting that "for ratification sufficient to justify punitive damages against corporation, there must be proof that officers, directors, or managing agents had actual knowledge of the malicious conduct and its outrageous character"); McKinney v. Am. Airlines, Inc., 641 F. Supp. 2d 962, 983 (C.D. Cal. 2009) (rejecting punitive damages based on ratification since the "evidence presented by [plaintiff] does not raise a triable issue of fact that [defendant-employer] intended to approve an oppressive, fraudulent or malicious termination decision"); Ginda v.

---

[7] Valspar also seeks summary judgment on Barnes, Toussaint, and Wallace's punitive damages claims. However, those arguments are not considered since none of Barnes, Toussaint, or Wallace's underlying claims survive summary judgment.

_Exel Logistics, Inc._, 42 F. Supp. 2d 1019, n.7 (E.D. Cal. 1999). In this case, Jackson submits no evidence that an officer, director, or managing agent of Valspar knew of the outrageous nature of Villegas's statement that Jackson had walked off the job. Accordingly, this portion of Valspar's motion is granted.

### G. Dismissal Under Rule 25(a)(1)

Valspar also seeks dismissal with prejudice under Rule 25 of deceased Plaintiff Moses Anderson's claims, asserting that "more than 90 days have elapsed" since the suggestion of death was filed on the docket and served on Anderson's widow under Rule 4 and Cal. Civ. Proc. Code § 415.30, and yet "[n]o motion for substitution has been made with respect to Plaintiff Anderson." (Mot. to Dismiss 3:25—27.)

Rule 25(a)(1) provides that if a motion for substitution "is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed." The rule requires that nonparty successors or representatives, such as Anderson's widow, be alerted "to the consequences of death to [the] pending suit, [including] the need for action to preserve the claim." _Barlow v. Ground_, 39 F.3d 231, 233 (9th Cir. 1994). The docket reveals that Anderson's widow was notified by Valspar's counsel of the suggestion of death over ten months ago, that Anderson's widow subsequently signed an acknowledgment of her receipt of the suggestion of death, and that no motion for substitution has yet been filed. Since no motion for substitution has been filed, Anderson's claims are dismissed with prejudice. _See generally_ _Russell v. City of Milwaukee_, 338 F.3d 662 (7th Cir. 2003) (affirming dismissal with prejudice for failure to file substitution motion within ninety days after service and filing of suggestion of death); _Schalow v. San Bernardino Cnty._, 191 F.3d 461 (9th

Cir. 1999) (unpublished) (affirming denial of motion to substitute with prejudice).

//

### IV. CONCLUSION

For the stated reasons, Valspar's summary judgment motion on the claims of Launte Barnes, Frederick Toussaint, and Donald Wallace is granted. Further, Valspar's summary judgment motion is granted on Marcus D. Jackson's claims for harassment, retaliation, discrimination (based on Jackson's first two theories of liability), and punitive damages. Valspar's summary judgment motion is denied on Jackson's claims for retaliation in violation of public policy and discrimination in violation of Cal. Gov't Code § 12940(a) based on Jackson's termination. Moses Anderson's claims against Valspar are dismissed with prejudice.

Dated:  February 12, 2013

_____
GARLAND E. BURRELL, JR.
Senior United States District Judge